## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-cv-22337-ALTMAN/Reid

**ROQUE ALEXANDER BARAT,**

*Plaintiff,*

*v.*

**NAVY FEDERAL CREDIT UNION**,

*Defendant.*

_____/

### ORDER

Roque Alexander Barat, our Plaintiff, applied to refinance the mortgage on his home with Navy Federal Credit Union, our Defendant. After his application was denied, Barat sued Navy Federal, alleging one claim under the Equal Credit Opportunity Act and four claims under Florida's Consumer Collections Practices Act. The Defendant has since filed a Motion to Dismiss Count I (Violation of 15 U.S.C. § 1691), Count II (Violation of FLA. STAT. § 559.72(5)), and Count III (Violation of FLA. STAT. § 559.72(6)) of the Plaintiff's Second Amended Complaint. Having carefully reviewed the Motion, the parties' arguments, and the governing law, we now **GRANT** the Defendant's Motion to Dismiss Count I—and, exercising our discretion not to exercise supplemental jurisdiction over Barat's state claims, we **REMAND** Counts II–V to the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

### THE FACTS[1]

In 2019, Roque Alexander Barat, a veteran of the U.S. Coast Guard, opened a savings account with Navy Federal Credit Union ("Navy Federal"). *See* Second Amnd. Compl. ("SAC") [ECF No. 21]

---

[1] We take the following facts from the Plaintiff's Second Amended Complaint and accept them as true for purposes of this Order.

¶ 28. For several years, this account "remained largely unused" and held a $0 balance. *Id.* ¶ 30. But, on August 18, 2021, Navy Federal notified Barat that his account had been "fraudulently accessed" and "compromised" by an identity thief. *Id.* ¶¶ 30–32. The identity thief changed the mailing address on the account to a Virginia residence, applied for a credit card and a loan, and opened a checking account. *See id.* ¶¶ 32, 34. While the credit card and loan applications were denied, a debit card was issued to the thief for the checking account. *See id.* ¶ 35. Over the next twenty days, the thief then "used the fraudulently obtained debit card across different businesses in Virginia and to retrieve funds from the same ATM in Virginia several times," racking up a "balance of over $11,000" in the process. *Id.* ¶¶ 36–37.

Navy Federal notified Barat on October 25, 2021, that, although "identity theft of his savings account did occur, . . . he was still being held liable for $3,933.51 being marked as charge-off and a loss to [Navy Federal]." *Id.* ¶ 38. Barat refused to pay for any fraudulent charges and twice appealed the charge to Navy Federal, *see id.* ¶¶ 39–40, which denied both appeals "due to no new evidence being presented' in his claim, *id.* ¶ 40.

While the $3,933.51 balance was pending, Barat applied to refinance the mortgage on his current home, intending to "use a 'cash out refi' option" to put towards a "20% down payment for a new home." *Id.* ¶ 42. But, on March 14, 2022, Navy Federal notified Barat that his request to refinance his mortgage was denied. *Ibid.* In the denial letter, Navy Federal cited Barat's "[p]oor credit performance with Navy Federal" as the principal reason for rejecting his application. *Id.* ¶ 43; *see also* Statement of Credit Denial Termination or Change (the "Denial Letter") [ECF No. 21-2] at 3.[2]

---

[2] We "may consider exhibits attached to a motion to dismiss without converting the motion into one for summary judgment if the exhibits are (1) central to the plaintiff's claim and (2) their authenticity is not disputed." *Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1162 (11th Cir. 2019) (*citing United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 (11th Cir. 2015)). No one has contested the Denial Letter's authenticity—and, given its obvious significance to Barat's claims, we'll consider it here.

After this denial, Barat obtained a "conventional loan" from Freedom Mortgage with an interest rate of 4.125%. SAC ¶¶ 44, 47. This rate was "less optimal" than the VA Loans Navy Federal offered—which, according to Barat, "ranged from approximately 2.5% to 3.0%" at the time of the denial. *Id.* ¶¶ 46–47.

On March 31, 2022, Barat filed administrative complaints with the FBI Internet Crime Complaint Center and the Florida Department of Agriculture and Consumer Services about his $3,933.51 pending balance with Navy Federal. *Id.* ¶ 48. Six weeks later, on May 7, 2022, Barat received a letter from Navy Federal, attempting to collect on that balance, *id.* ¶ 49, and (some time after that) his membership with Navy Federal was terminated, *see id.* ¶ 50 ("Since NFCU's improper charge-off, Mr. Barat has lost membership to NFCU and any associated benefits at a particularly unfortunate time: when he is in the process of applying for a mortgage."). Navy Federal, however, soon changed course. On December 29, 2022, Navy Federal informed Barat that his claim was "valid" and credited $4,433.68 to his savings account. *Id.* ¶ 51; *see also* December 29, 2022, Letter [ECF No. 21-5] at 2.

Barat nevertheless sued Navy Federal in Florida state court under the Florida Consumer Collection Practices Act ("FCCPA"), alleging that Navy Federal "harras[ed]" him, in violation of FLA. STAT. § 559.72(7), by seeking to enforce the debt, *see* First State-Court Compl. [ECF No. 1-4] ¶¶ 44–45, and that Navy Federal unlawfully attempted to "enforce a debt with knowledge that the debt is not legitimate," in violation of FLA. STAT. § 559.72(9), *id.* ¶¶ 51–55. Barat then amended his complaint in state court, adding a federal claim under the Equal Credit Opportunity Act ("ECOA") and two new claims under the FCCPA for violations of FLA. STAT. §§ 559.72(5) and 559.72(6). *See* Amnd. State Count Compl. [ECF No. 1-3] ¶¶ 52–84. Navy Federal timely removed the case here (to federal court), *see* Notice of Removal [ECF No. 1], after which Barat filed his Second Amended Complaint, which retains the same counts he'd asserted in the previous complaint and adds requests for punitive damages, *see* SAC ¶¶ 29–84.

In Count I, Barat alleges that Navy Federal violated the ECOA "by providing inaccurate reasons for taking such adverse action: his alleged 'Poor credit performance.'" *Id.* ¶ 55 (quoting Denial Letter at 3). In Counts II and III, brought under the FCCPA, Barat claims that Navy Federal disclosed "false information regarding Plaintiff to a department responsible for mortgage applications, which lead to his mortgage denial," *id.* ¶ 62 (Count II), and that Navy Federal "disclos[ed] information concerning the existence of a debt known to be reasonably disputed by the debtor without disclosing that fact," *id.* ¶ 68 (Count III). Counts IV and V simply reassert the state-law claims under FLA. STAT. §§ 559.72(7), -(9) Barat had included in the First State-Court Complaint. *See id.* ¶¶ 72–84.

The Defendant has since moved to dismiss only Counts I, II, and III. *See* Defendant's Motion to Dismiss ("MTD") [ECF No. 26] at 1. That Motion is now ripe for adjudication. *See generally* Defendant's Reply [ECF No. 31].

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual

allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

ANALYSIS

**I.        Count I: 15 U.S.C. § 1691**

The Plaintiff first claims that Navy Federal violated the ECOA "by providing inaccurate reasons" for rejecting his loan application in the Denial Letter. SAC ¶ 55; *see also* Denial Letter at 3 (citing "[p]oor credit performance with Navy Federal" as the reason for denial). The ECOA makes it unlawful for "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program; or (3) because the applicant has in good faith exercised any right under this chapter." 15 U.S.C. § 1691(a). Navy Federal argues that, "to state a claim under the ECOA, Plaintiff must allege that he is a member of the protected class," MTD at 4, which—at least with respect to the protected characteristics listed in the statute—he does not, *see generally* SAC.

Barat doesn't disagree that the Amended Complaint fails to allege discrimination based on a protected class. But, he says, making this allegation is not necessary to bring a claim under § 1691. *See* Plaintiff's Response in Opposition ("Pl.'s Resp.") at 4 ("Plaintiff does not have to allege Defendant denied him credit due to unlawful discrimination to bring an ECOA claim."). In Barat's view, § 1691(d), which enumerates the procedures a creditor must follow when taking an "adverse action" against an applicant, creates an independent cause of action for an ECOA suit. *See ibid.* ("There are two different potential ECOA violations: claims for discrimination (15 U.S.C. § 1691(a)) and claims for inadequate notice (15 U.S.C. § 1691(d)).").

We agree with Barat. A plaintiff may state a "cognizable claim" under § 1691 by alleging that a "creditor failed to comply with the *separate and independent* notification requirements of § 1691(d)."

5

*Jochum v. Pico Credit Corp. of Westbank, Inc.*, 750 F.2d 1041, 1044 n.3 (5th Cir. 1984) (citing *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 145–47 (5th Cir. 1983)); *see also Yeh Ho v. Wells Fargo Bank, N.A.*, 2020 WL 820264, at *7 (S.D. Fla. Feb. 19, 2020) (Marra, J.) (collecting cases). This rule conforms nicely with the ECOA's text, which entitles "[e]ach applicant against whom adverse action is taken . . . to a statement of reasons for such action from the creditor." 15 U.S.C. § 1691(d)(2). An "applicant" is *"any* person who applies to a creditor directly for an extension, renewal, or continuation of credit." *Id.* § 1691a (emphasis added); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 228 (2012) ("[T]he definition [provided in a statute] is virtually conclusive."). Since the statute doesn't qualify one's status as an "applicant" by one's membership in a protected class, we won't either. *See* SCALIA & GARNER at 93 ("The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it.").[3] In short, the "Plaintiff need not allege membership in a protected class to state a claim for violation of the ECOA's written notification requirement." *Cannon v. Metro Ford, Inc.*, 242 F. Supp. 2d 1322, 1331 (S.D. Fla. 2002) (Lenard, J.).

Still, Barat fails to state an inadequate-notice claim under § 1691(d). When taking an "adverse action"—*i.e.*, "a denial or revocation of credit," 15 U.S.C. § 1691(d)(6)—a creditor generally must provide the applicant with "statements of reasons in writing" or a "written notification . . . [of] the

---

[3] *See also Smith ex rel. M.S. v. Crisp Regional Hosp., Inc.*, 985 F.3d 1306, 1309 (11th Cir. 2021) ("[W]e are not allowed to add words to or rewrite a statute."); *cf. Medellin v. Texas*, 552 U.S. 491, 521–22 (2008) ("The judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress. . . . Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such a result."); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *Savage Servs. Corp. v. United States*, 25 F.4th 925, 935 (11th Cir. 2022) ("Congress, in short, knows how to waive sovereign immunity when it wants to. And, unfortunately for Savage, it chose not to include these well-hashed sovereign-immunity waivers in the OPA.").

applicant's right to a statement of reasons," *id.* § 1691(d)(2). A statement of reasons is sufficient only if it includes the specific reasons for the adverse action. *Id.* § 1691(d)(3).

Because Navy Federal denied Barat's credit application, *see, e.g.,* SAC ¶ 42 ("Mr. Barat was denied a mortgage refinancing opportunity of his current home."), it had to comply with § 1691(d)'s notice requirements. And it did. Navy Federal sent Barat the Denial Letter on March 14, 2022, informing him that his application had been denied. *See* Denial Letter at 3 ("Description of Action Taken: Credit Denial"). And the Denial Letter explicitly says that the "[p]rincipal [r]eason[ ]" for the denial was Barat's "[p]oor credit performance with Navy Federal[.]" *Ibid.* According to Barat, this reason doesn't satisfy § 1691's procedural requirements *both* because it's "inadequate" *and* because it's "completely inaccurate." Pl.'s Resp. at 6. We'll take—and reject—each argument in turn.

Navy Federal's stated reason for the denial—Barat's "poor credit performance with Navy Federal"—adequately meets the notice requirements of § 1691(d). "Poor credit performance with [the creditor]" is specifically listed as a suggested reason for denial on Form C-1, the sample notification form provided by the Consumer Financial Protection Bureau ("CFPB") "for use in notifying an applicant that adverse action has been taken on an application." 12 C.F.R. pt. 202, App. C. And "[p]roper use of Form[ ] C–1 . . . will satisfy the requirement of [the statement of specific reasons for the action taken]." *Ibid.* Because Navy Federal's reason tracked the acceptable reasons set out in the sample form, we cannot say that it was inadequate. *See, e.g., King v. Police & Fire Fed. Credit Union,* 2019 WL 2226049, at *5 (E.D. Pa. May 22, 2019) ("In short, where a creditor's reasons for denying a credit application hew closely to the reasons that have been approved by the CFPB, courts will generally conclude that such reasons are specific enough[.]"); *see also Coulibaly v. J.P. Morgan Chase Bank, N.A.,* 2012 WL 3985285, at *5 n.4 (D. Md. Sept. 7, 2012) ("[T]he explanation of denial provided by Chase is sufficiently detailed to comply with the ECOA. . . . In a sample form provided in Appendix C to Regulation B, '[i]ncome insufficient for amount of credit requested' is listed as an example of a

'[p]rincipal reason[ ]' for a denial of credit."), *aff'd*, 526 F. App'x 255 (4th Cir. 2013); *Aikens v. Nw. Dodge, Inc.*, 2006 WL 59408, at *4 (N.D. Ill. Jan. 5, 2006) ("[T]he notice requirement was not intended to ensure that statements of reasons be given in the form of long, detailed personal letters; rather, a short, check-list statement will be sufficient so long as it reasonably indicates the reasons for the adverse action.").

Barat's "inaccuracy" contentions fare no better. Barat claims that he never had "poor credit performance with Navy Federal"—and that Navy Federal's reason was therefore inaccurate—*both* because Navy Federal eventually acknowledged that his account had been defrauded *and* because Barat's account with Navy Federal didn't meet the ECOA's definition of "credit." Pl.'s Resp. 6–7. Barat is wrong on both points.

For starters, Navy Federal's later recognition of the fraud (on December 29, 2022), has no bearing on its decision to deny Barat's application more than eight months earlier. To comply with § 1691(d), a creditor need only provide the "specific reasons for the adverse action *taken*," 15 U.S.C. § 1691(d)(3) (emphasis added), which is precisely what Navy Federal did in its Denial Letter, *see* SAC ¶ 43 ("The reasons for the denial were listed as 'Poor credit performance with Navy Federal.'"). This use of the past tense denotes that the creditor's explanation must describe "events that have already taken place," *SEJ Enters. v. Centra Tech., Inc.*, 2012 WL 3522658, at *7 (E.D. Va. Aug. 10, 2012); *see also* SCALIA & GARNER at 140 ("Words are to be given the meaning that proper grammar and usage would assign them.")—*i.e.*, Navy Federal's *past* denial of Barat's application "[o]n or about March 14, 2022," SAC ¶ 42—and (it goes without saying) needn't predict changing future circumstances. Nor does § 1691 impose any affirmative obligation on the creditor to modify its reasoning or to revise its prior determination. *See Grant v. World Class Mortg. Corp.*, 1990 WL 19466, at *2 (N.D. Ill. Feb. 20, 1990) ("[The ECOA and Regulation B] do not require that adverse action be based upon reliable

information, and do not require reconsideration of an application when it turns out that adverse action has been taken upon unreliable information.").

The Plaintiff's second argument—that he never had "credit performance" with Navy Federal—is creative but ultimately misses the mark. The ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment." 15 U.S.C. § 1691a(d). As Barat sees it, "checking and savings accounts do not meet this definition unless there is overdraft protection," which allows the account holder to incur a "debt that . . . is subject to interest, and is deferred until later." Pl.'s Resp. at 7; *see also Dunn v. Am. Express Co.*, 529 F. Supp. 633, 634 (D. Colo. 1982) ("Although plaintiff's affidavit states that she considered the issuance of said express Teller Card as an expansion of her ability to make more credit transactions with her savings account, there is simply no evidence that anything that she applied for would have given her the *right* to defer the payment of any debt." (cleaned up)). And, Barat says, he "has not alleged" that he had overdraft protection on the accounts.[4] Pl.'s Resp. at 7. So, Barat continues, because the fraudulent activity on

---

[4] It's true that the Second Amended Complaint doesn't explicitly allege that the accounts had "overdraft privileges." *See generally* SAC. But it does say that, as a result of the "fraudulent charges," Navy Federal sought to hold Barat "liable for $3,933.51 being marked as charge-off and a loss[.]" *Id.* ¶¶ 38–39. A checking or savings account may implicate credit if it has "overdraft protection or some other agreement . . . that obligated the bank to honor a check even if the account lacks the necessary funds." *Anderson v. Walker*, 2006 WL 3335123, at *4 n.5 (M.D. Ga. Nov. 16, 2006); *see also Jones v. Vargas*, 2019 WL 13253487, at *6 (C.D. Cal. Nov. 6, 2019) ("Official interpretation of Regulation B implementing 15 U.S.C. § 1691(a) shows that overdraft protections for checking accounts may constitute 'overdraft line[s] of credit' for which a 'creditor may require that all persons authorized to draw on the transaction account assume liability for any overdraft.'" (quoting 12 C.F.R. § 1002, Supp. I.)). If the identity thief was able to draw the excess funds because the accounts had overdraft privileges, the accounts likely *would* constitute credit.
Based on the facts alleged in the Amended Complaint, however, we simply don't have enough information about the account—including whether the outstanding balance accrued interest, when payment on the balance was due, and whether the account was authorized to overdraw funds—to resolve this question at this early stage of the case. *See Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016) ("[A] court reviewing a motion to dismiss must draw all reasonable inferences from the factual allegations in a plaintiff's complaint in the plaintiff's favor." (citing *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010))).

his checking and savings account don't implicate his "credit," Navy Federal's reason for denying his application was inaccurate.

Several district courts (it's true) have held that a checking or savings account, without more, doesn't qualify as "credit" and, therefore, doesn't trigger the protections of § 1691. *See, e.g., Dunn*, 529 F. Supp. at 634; *Jones v. Vargas*, 2019 WL 13253487, at *5 (C.D. Cal. Nov. 6, 2019) ("Opening and closing a checking or saving account does not itself constitute a credit transaction within 15 U.S.C. § 1691(a)."); *Butler v. Cap. Fed. Sav.*, 904 F. Supp. 1230, 1234 (D. Kan. 1995) ("[The] opening of a savings account is not a credit transaction because it is not a right to defer payment of a debt."). But the Plaintiff asks us to go one step further and hold that transaction activity in such accounts cannot constitute "poor credit performance" within the meaning of Form C-1. *See* Pl.'s Resp. at 7 ("The key difference between *Dunn* and Mr. Barat's claims are that the former was dismissed because the plaintiff was denied a checking account with no overdraft protection, as compared to the latter where . . . Navy Federal [is] in violation of § 1691(d) because it is providing inaccurate reasons for the mortgage denial since 'poor credit performance' does not apply to savings accounts.").

In general, a "word or phrase is presumed to bear the same meaning throughout a text." SCALIA & GARNER at 170. This presumption, however, "can hardly be said to apply across the whole *corpus juris*." *Id.* at 172. Of course, § 1691a's definition of "credit" and the example of "poor credit history" provided in Form C-1 appear in different legal texts. At the same time, the CFPB promulgated Form C-1 pursuant to its authority under the ECOA, *see* 15 U.S.C. § 1691b(a) ("The [CFPB] shall prescribe regulations to carry out the purposes of this subchapter."), and both uses of the word "deal[ ] with the same subject," SCALIA & GARNER at 173—thus bolstering Barat's case for consistent interpretation.

Fortunately, we needn't decide this thorny question of statutory construction today because Barat's argument would fail *even if* "poor credit performance" was an inaccurate description of Navy

Federal's denial of Barat's application. That's because "the notice provision makes no requirement regarding falsity or truth." *Ruiz v. Samuel I. White, P.C.*, 2009 WL 10687930, at *4 (E.D. Va. Nov. 9, 2009); *see also Wigod v. PNC Bank, N.A.*, 338 F. Supp. 3d 758, 767 (N.D. Ill. 2018) ("Nothing in that provision indicates that the statement is inadequate if the reason given by the creditor turns out to be factually unfounded."). Rather, "allegations of falsity are properly adjudicated [only] in the context of an ECOA *discrimination claim*," *Ruiz*, 2009 WL 10687930, at *4 (citing *Para v. United Carolina Bank*, No. 97-cv-54, 1998 U.S. Dist. LEXIS 16843, at *7–10 & n.1 (E.D.N.C. Aug. 26, 1998)), which the Plaintiff concedes he isn't advancing here, *see* Pl.'s Resp. at 5 ("Because there is nothing in ECOA's notice provision that requires allegations of discrimination, ECOA notice claims do not require a plaintiff to plead and prove discrimination.").

Because Barat has *neither* alleged unlawful discrimination under 15 U.S.C. § 1691(a) *nor* pled sufficient facts to state a claim for inadequate notice under 15 U.S.C. § 1691(d), we **GRANT** the Defendant's Motion to Dismiss Count I.

## II.  The Remaining State-Law Counts

As we've said, Barat also brings four state-law causes of action—each asserting a distinct violation of FLA. STAT. § 559.72. The Defendants ask us to dismiss only Count II, which claims that Navy Federal violated FLA. STAT. § 559.72(5) when it "disclosed false information regarding Plaintiff to a department responsible for mortgage applications, which lead [sic] to his mortgage denial," SAC ¶ 62, and Count III, which alleges that the Defendant "violated Fla. Stat. § 559.72(6) by disclosing information concerning the existence of a debt known to be reasonably disputed by the debtor without disclosing that fact," *id.* ¶ 68.

We won't reach the merits of the Defendant's arguments on these claims, however, because the Plaintiff's "federal claim[] [is] the only mechanism by which we [can] exercise original jurisdiction

over this case."[5] *Floyd v. Broward Cnty. Sheriff's Dep't*, 2019 WL 4059759, at *4 (S.D. Fla. Aug. 28, 2019) (Altman, J.). And a district court may decline to exercise supplemental jurisdiction over a state-law claim when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[C]onsiderations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966) (establishing these factors). The power to hear cases via supplemental jurisdiction "need not be exercised in every case in which it is found to exist." *Gibbs*, 383 U.S. at 726. As the Supreme Court has said, supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *Ibid.* We now follow the Supreme Court's admonition and decline to exercise our supplemental jurisdiction over Barat's state-law claims (Counts II–V) here.[6]

---

[5] The SAC makes this point clearly. *See* SAC ¶ 3 ("This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 [federal-question jurisdiction] and 1441(a) [removal jurisdiction]."). And it doesn't plead any facts to establish our diversity jurisdiction. *See id.* ¶ 4 ("Supplemental jurisdiction exists over Plaintiff's FCCPA claims pursuant to 28 U.S.C. § 1367."). Nor has Navy Federal met its burden of showing that it was entitled to remove this case under our diversity jurisdiction. *See Matrix Z, LLC v. Landplan Design, Inc.*, 493 F. Supp. 2d 1242, 1245 (S.D. Fla. 2007) (Cohn, J.) ("On a motion to remand, the removing party bears the burden of establishing jurisdiction." (citing *Tapscott v. M.S. Dealer Serv. Corp.*, 77 F.3d 1353, 1356 (11th Cir. 1996), *overruled on other grounds by Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1076 (11th Cir. 2000))). In its Notice of Removal, Navy Federal suggested that, "[b]ased on the relief sought throughout the Amended Complaint, the amount in controversy will exceed $75,000." Notice of Removal ¶ 29. But it offers no evidence for this position, and it's well-settled that a "conclusory allegation that the jurisdictional amount is satisfied is not sufficient to meet defendant's burden." *Briganti v. Ford Motor Co.*, 2008 WL 11333512, at *1 (S.D. Fla. Sept. 22, 2008) (Middlebrooks, J.) (citing *Leonard v. Enter. Rent A Car*, 279 F.3d 967, 972 (11th Cir. 2002)). We therefore decline to exercise our diversity jurisdiction over the remaining state-law claims.

[6] Exercising supplemental jurisdiction over these state-law claims would be particularly inappropriate here—since the Defendant's arguments for dismissal rest on purely state-law grounds. *See* MTD at 12 (asking us to dismiss Counts II and III because Barat fails to "allege a 'disclosure' for purposes of the FCCPA (quoting Fla. Stat. § 559.72)); *id.* at 9 (arguing that Counts II and III fail because "Navy Federal did not make such a 'disclosure' in the course of 'collecting consumer debts,' as required to subject Navy Federal to liability under the FCCPA" (emphasis omitted) (quoting Fla. Stat. § 559.72)); *ibid.* ("Plaintiff's recovery of statutory damages under the FCCPA is limited to only $1,000 total for any and all violations of the FCCPA."). For reasons of fairness and comity, these exclusively state-law questions should be handled by a state-court judge. *See Lawson v. City of Miami Beach*, 908 F. Supp. 2d

Where, as here, a case has been removed from state court, "federal district courts . . . must remand, rather than dismiss, state claims over which they decline to exercise supplemental jurisdiction." *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1226–27 (11th Cir. 2010). So, rather than dismiss the entire action, we'll remand the remaining state-law claims to the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

\*\*\*

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. The Defendant's Motion to Dismiss [ECF No. 26] is **GRANTED in part** as to Count I. Accordingly, Count I of the Second Amended Complaint [ECF No. 21] is **DISMISSED without prejudice**.

2. The remaining state-law claims, Counts II–V of the Second Amended Complaint [ECF No. 21] are **REMANDED** to the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

3. The Defendant's Motion to Dismiss [ECF No. 26] is **DENIED as MOOT** as to Counts II and III.

4. This case shall remain **CLOSED**. All deadlines and hearings are **TERMINATED**, and any pending motions are **DENIED as MOOT**.

**DONE AND ORDERED** in the Southern District of Florida on January 26, 2024.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:       counsel of record

---

1285, 1292–93 (S.D. Fla. 2012) (Moreno, C.J.) ("[C]onsiderations of practicality and comity counsel that a state judge is best equipped to resolve state claims." (cleaned up)).